IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


TERESA L. HUMMEL,

                Plaintiff,

     vs.                                 Civil Action 2:06-CV-570
                                        Judge Graham
                                        Magistrate Judge King

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.


## REPORT AND RECOMMENDATION

This is an action instituted under the provisions of 42 U.S.C. §§405(g), 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income. This matter is now before the Court on plaintiff's *Statement of Errors* and the Commissioner's *Memorandum in Opposition*.

Plaintiff Teresa L. Hummel filed her applications on July 15, 2003. The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

On February 9, 2005, plaintiff, represented by counsel, appeared and testified at the administrative hearing, as did Larry Bell, who testified as a vocational expert. In a decision dated May 5, 2005, the administrative law judge found that plaintiff suffers from a variety of impairments, both physical and mental, but that she nevertheless has the residual functional capacity to perform light exertion that affords a sit/stand option, with certain postural and environmental limitations

and in a low stress environment; she would be limited to unskilled work involving only routine and repetitive tasks and should have no more than occasional interaction with any other person. Relying on the testimony of the vocational expert, the administrative law judge found that this residual functional capacity allows plaintiff to perform a significant number of jobs in the national economy, including such jobs as laundry folder and office cleaner. Accordingly, the administrative law judge concluded that plaintiff is not disabled within the meaning of the Social Security Act. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on May 19, 2006.

Plaintiff Teresa Hummel was 40 years of age at the time the administrative law judge issued his decision. She has a twelfth grade education in special education classes and additional training and certification as a nurse's aide. *A.R.* 393, 395. She last worked as a nurse's aide, feeding, bathing and walking elderly patients. She quit working because of health problems. *A.R.* 396.

Plaintiff characterized her migraine headaches and depression as her most significant conditions. She also complained of fibromyalgia and emphysema. Her medical problems required that she miss work, typically, three days per week. *A.R.* 402.

1. Migraine Headaches

Plaintiff testified that she experiences migraine headaches once or twice a month, each lasting 3 to 4 days. *A.R.* 396. However, neurological and musculoskeletal findings have been essentially normal. *See, e.g.*, A.R. 251, 252, 254, 258, 266. A January 2003 non-contrast

MRI of the brain suggested some abnormality of white matter, *A.R.* 238, but a contrast MRI administered the following month was more suggestive of partial volume averaging with an adjacent sulcus. *A.R.* 234.  An EEG was normal both awake and asleep.  *A.R.* 235.  A June 2003 CT scan of the head for complaints of headache was negative.  *A.R.* 224.  X-rays of the cervical spine performed in June 2004 were unremarkable.  In August of that year, Gurmeet Singh, M.D. a Board-certified neurologist who treats plaintiff's headaches, administered trigger point injections, which plaintiff tolerated well.  *A.R.* 328.  An MRI of the cervical spine administered in September 2004 for complaints of worsening neck pain and cephalgia was generally satisfactory.  *A.R.* 331-32.  Dr. Singh reported that plaintiff does reasonably well with Elavil.  *A.R.* 257.

2. Bipolar Disorder and Depression

Plaintiff has been diagnosed with bipolar disorder and depression.  ". . . I've noticed I've been getting down and depressed a lot and crying and don't want to be around anybody or anything. . . . And it just gets me down to where I end up trying to hurt myself or someone else."  *A.R.* 398.  She has attempted suicide on three occasions, most recently in 2003, with resulting hospitalizations.  *A.R.* 399.  She continues to experience crying moodiness and suicidal ideation despite psychiatric treatment and counseling.  *A.R.* 400.

Plaintiff's treating psychiatrist is Ali Mohamad Melhem, M.D. Her mental health counselor is Stan Gornik.  In May 2003, Dr. Melhem reported a past addiction to pain medication. *A.R.* 279 - 80.  On mental status examination, plaintiff's mood was depressed and affect was restricted.  Dr. Melhem diagnosed bipolar affective disorder, type II, depression without psychotic features, r/o bipolar disorder nos, r/o

major depressive disorder, chronic, history of substance abuse, r/o active. *A.R.* 280. He placed plaintiff's Global Assessment of Functioning ["GAF"] at 50 - 55. *Id.*

In June 2003, plaintiff was hospitalized following an overdose of prescribed medication. *A.R.* 191. On psychiatric examination, Dr. Melhem found plaintiff to be alert and oriented. Her mood was depressed and her affect was restricted. *A.R.* 196. Judgment and insight were fair to poor. Cognitive abilities were average. There was no severe memory loss. *A.R.* 197. Plaintiff was discharged in stable condition without suicidal or homicidal ideation and final diagnoses of bipolar affective disorder, type II, and migraine headaches. Her GAF upon admission was 35 but was 60 upon discharge. *A.R.* 191.

In October 2003, Alan White, Ph.D., performed a consultative psychological evaluation at the request of the state agency. Plaintiff reported problems getting along with neighbors and public officials. *A.R.* 213. She is able to care for herself but relies on her sons to perform most household duties. On examination, plaintiff's affect was flat. *A.R.* 214. She was oriented. Immediate memory was mildly impaired but long-term memory was intact. *A.R.* 215. Her fund of knowledge was borderline. Scores on the WAIS-III and the WMS-III were "invalid and unreliable" because of plaintiff's "less than optimal performance." *A.R.* 217. Dr. White estimated that plaintiff's true I.Q. falls in the high borderline range of intellectual functioning. According to Dr. White, plaintiff suffers from bipolar disorder, not otherwise specified, and borderline intellectual functioning. He placed her GAF at 58. According to Dr. White,

> Ms. Hummel's ability to remember, sustain, and concentrate is mildly impaired. Her ability to follow simple directions is not impaired. Her ability to get along with others is mildly

4

> impaired.  Ms. Hummel's ability to withstand work
> stressors would be mild to moderately impaired due
> to bipolar disorder.

*A.R.* 218.

In October 2003, Dr. Melhem and plaintiff's counselor reported to the state agency that plaintiff had not been seen at the clinic since June of that year.  According to these mental health experts, plaintiff

> reported some improvement in June 2003 with her
> medications [although] she has a history of poor
> treatment compliance. . . . This is clearly
> indicative of the extreme level of instability both
> emotionally and behaviorally that this client
> experiences.
>
> Due to serious and significant symptoms that
> severely impact this client's functioning, it is
> not possible for her to sustain employment efforts
> and she should be granted benefits.

*A.R.* 275.  At an office visit shortly thereafter, Dr. Melhem indicated that plaintiff was alert, oriented, calm and cooperative.  She had no suicidal or homicidal ideation.  Judgment and insight were good.  Dr. Melhem continued plaintiff on medication and directed that she return in 2 to 3 months.  *A.R.* 273.

In November 2003, state agency psychologists opined that the record documents bipolar disorder, in partial remission, properly evaluated by reference to Listing 12.04.  Considering the "B" criteria of the Listing, the psychologists characterized plaintiff's restriction of activities of daily living and difficulties in maintaining social functioning as mild and her difficulties in maintaining concentration, persistence or pace as moderate.  She had experienced one or two episodes of decompensation.  *A.R.* 299.  In an assessment of plaintiff's mental residual functional capacity, the state agency psychologists indicated

that plaintiff was moderately limited in her ability to maintain
attention and concentration for extended periods, in her ability to
complete a normal workday and workweek without interruptions from
psychologically based symptoms, in her ability to interact appropriately
with the general public and to respond appropriately to criticism from
supervisors and in her ability to respond appropriately to changes in the
work setting. *A.R.* 302 - 03. According to these psychologists,
plaintiff

> is capable of following at least simple
> instructions, she can attend to SRRTs {simple,
> routine, repetitive tasks], she can relate to
> coworkers and supervisors, work with the general
> public is contraindicated. Clmt has the capacity
> to adapt to a work setting with SRRTs, [without]
> strict productivity or time demands and with
> limited contact with the general public.

*A.R.* 304.

In December 2004, plaintiff's mental health counselor
completed a questionnaire as to plaintiff's mental residual functional
capacity and characterized as either "marked" or "extreme" almost all
work-related limitations posed by plaintiff's mental impairments. He
also indicated that plaintiff's condition would deteriorate if she were
placed under the stress of a job. *A.R.* 341. He specifically indicated
that plaintiff's agitation, anger and anxiety are likely to escalate with
the stress of daily work. *Id.*

In February 2005, Dr. Melhem completed a questionnaire as to
plaintiff's mental residual functional capacity. He characterized
plaintiff's mental impairments as either "marked" or "extreme" except in
the area of her ability to relate to the general public, to maintain
socially appropriate behavior and to maintain personal appearance and
hygiene, which he characterized as "moderate." *A.R.* 359. Dr. Melhem
also indicated that plaintiff's condition would deteriorate if she were

6

placed under the stress of a job:

> Client['s] symptoms have strong tendency to be
> exacerbated by psycho-social stressors & daily
> pressures related to task completion.

*Id.*


3. Fibromyalgia, Emphysema and Other Conditions and Symptoms

Plaintiff testified that she suffers from emphysema and that her doctor has prescribed oxygen. However, she continues to smoke cigarettes because "the smoking helps relieve some of my stress." *A.R.* 401. Plaintiff also testified that she experiences severe, constant pain, for which she takes hot baths and Tylenol or Advil. *A.R.* 402. Her condition is aggravated by cold weather. *A.R.* 404 - 05. She testified that her doctors have never recommended exercise for her fibromyalgia. *A.R.* 403.

An MRI of the lumbar spine administered in October 2002 for complaints of back pain revealed mild degenerative decreased disc water content at L3-4 and L5-S1 with a mild concentric annulus bulging at L3-4 and L4-5. The MRI was read as "essentially within normal limits." *A.R.* 242.

The record also reflects a 3-day hospitalization in January 2003 for complaints of chest pain. Stress tests were negative and plaintiff was discharged with final diagnoses of atypical chest pain, pneumonia, hypertriglyceredemia, tobacco abuse and depression. *A.R.* 174.

In June 2003, Himalaya Patcha, M.D., performed a physical examination of the plaintiff during the course of a hospitalization and noted that plaintiff's gait was normal and there was no muscle wasting. *A.R.* 204. In December 2003, Dr. Pacha diagnosed arthritis and degenerative joint disease and prescribed Vioxx. *A.R.* 313. Dr. Pacha's

office notes repeatedly indicate that plaintiff's motor and sensory functions "appear to be normal." *A.R.* 307, 308, 310, 312, 314, 318, 320.

Nan M. Bissell, M.D., has been plaintiff's treating general practitioner since January 2002. Dr. Bissell reported to the state agency in August 2003 that plaintiff is "always depressed, defensive about health – esp headaches and her family." *A.R.* 163. She is easily frustrated, her concentration is reduced and her memory is fair. *Id.* Her headaches, which occur 4-5 time per week, are aggravated by noise and preclude both work and home responsibilities. Antidepressants and diet provided only some response and plaintiff's ability to tolerate stress worsened with time. *A.R.* 164. Dr. Bissell diagnosed migraines, tension headaches, mood swings and anxiety. *Id.*

In August 2003, Charles E. Barrett, D.O., a specialist in pain management, reported that he began treatment of plaintiff in May of that year. He diagnosed joint pain and neuropathy and noted bilateral shoulder pain with reduced range of motion and decreased sensation of the hands and feet bilaterally. *A.R.* 209. Prescription pain medication provided only partial relief. *A.R.* 210. According to Dr. Barrett, plaintiff is "unable to lift, raise arms above shoulders [without] dif[ficulty]." *Id.* He also noted a poor attention span and commented that plaintiff was unable to attend work on a regular basis. *Id.*

In November 2003, plaintiff presented to a hospital emergency room with complaints of pain in her neck and shoulders. She was discharged with final diagnoses of paracervical/trapezius muscle spasms and questionable fibromyalgia. She was prescribed Flexeril. *A.R.* 223.

In July 2004, plaintiff was diagnosed with chronic pelvic pain secondary to endometriosis. *A.R.* 347. She later underwent a hysterectomy. *A.R.* 348.

ADMINISTRATIVE HEARING

Plaintiff testified at the administrative hearing that, on a typical day, she spends most of her time watching television while sitting on a couch. She can do the dishes and "maybe" run a sweeper. *Id.* She accompanies her fiancé to the grocery store and can carry extremely light packages. *A.R.* 404. However, she also expressly testified that she's "lucky if [she gets] maybe a 25 ba[g] of dog food over [her] shoulder." *A.R.* 406. She has difficulty sleeping. She goes to bed between midnight and 1:00 a.m. but does not get out of bed until 3:00 or 4:00 p.m. *A.R.* 404. She estimated that she can stand for up to 2 hours at a time.

The vocational expert was asked to assume a claimant with plaintiff's vocational profile who is able to perform light work with a sit/stand option and only occasional postural movement without any climbing of ladders, ropes or scaffolds; the claimant should not be exposed to temperature extremes, dampness, humidity or environmental pollutants, should work in a low stress environment, without a production line pace or independent decision making responsibilities; the claimant would be limited to unskilled work involving only routine, repetitive tasks with no more than occasional interaction with others. *A.R.* 408. In response, the vocational expert testified that such an individual could perform such jobs as a laundry folder and office cleaner, of which there are more than 400,000 positions nationally. *A.R.* 409. Dr. Melhem's mental residual functional capacity assessment would be inconsistent with competitive work. Moreover, absence more than two days per month would result in the termination of any employment. *Id.*

9

DECISION OF THE ADMINISTRATIVE LAW JUDGE

In his decision, the administrative law judge found that plaintiff's severe impairments consist of headaches, obesity, bipolar disorder, depressive disorder and borderline intellectual functioning. He found that plaintiff's additional complaints of chronic neck and back pain, lung disease and emphysema were unsupported by the record. Her complaints of fibromyalgia and emphysema, the administrative law judge found, have never been confirmed.

The administrative law judge evaluated plaintiff's bipolar and depressive disorders by reference to Listing 12.04. That listing addresses documented affective disorders, Listing 12.04A, and requires, in addition, that the record also document either the conditions outlined in Listing 12.04B or 12.04C. In cocluding that plaintiff's mental impairments did not satisfy the "B" criteria of the listing, the administrative law judge found that plaintiff suffers a mild limitation in activities of daily living and moderate limitations in social functioning, concentration, persistence and pace. The administrative law judge also found that plaintiff has had no repeated episodes of decompensation of extended duration. He also found that plaintiff's impairments did not satisfy the "C" criteria of Listing 12.04.

Having found that plaintiff's mental impairments neither meet nor equal Listing 12.04, the administrative law judge went on to determine plaintiff's residual functional capacity. In this regard, the administrative law judge characterized plaintiff's statements regarding and evidence of subjective complaints as not entirely credible.

The administrative law judge rejected Dr. Barrett's opinion of disability as unsupported by any treatment records, diagnostic studies

or medical reports.  *A.R.* 25.  He rejected the extremely restrictive mental residual functional capacity assessments of Dr. Melhem and plaintiff's counselor in light of their "relatively moderate findings and GAF scores."  *A.R.* 28.  He specifically rejected the questionnaires completed by these mental health experts as "based exclusively on the plaintiff's subjective complaints, hav[ing] no sort of independent support in the record whatsoever, are not supported by the treatment records and are contrary to the claimant's own work history. ..."  *A.R.* 28.  Instead, the administrative law judge accepted the assessments of state agency psychologists and physicians as to plaintiff's ability to perform work-related activities associated with a reduced range of light work.  Although this residual functional capacity precluded the performance by plaintiff of her past relevant work as a nurse's aide, the administrative law judge relied on the testimony of the vocational expert to find that plaintiff can nevertheless perform work that exists in significant numbers in the national economy.  The administrative law judge therefore concluded that plaintiff is not disabled.

STANDARD OF REVIEW

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389 (1971).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Secretary of Health &*

*Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility.  *See Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989);  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole.  *Kirk*, 667 F.2d at 536.  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *Longworth v. Comm'r Soc. Sec.,* 402 F.3d 591, 595 (6th Cir. 2005).

DISCUSSION

Plaintiff contends that the administrative law judge erred in failing to conclude that plaintiff's psychological impairments meet Listing 12.04 and prevent sustained work activity.  In this regard, plaintiff specifically challenges the administrative law judge's rejection of the assessment of plaintiff's treating psychiatrist, Dr. Melhem, and counselor, Stan Gornik.  Plaintiff contends that Mr. Gornik's and Dr. Melhem's diagnoses and assessments are supported by the medical evidence of record.

Plaintiff also contends that the administrative law judge failed to properly consider the combined effect of plaintiff's various impairments.

Finally, plaintiff also appears to challenge the

administrative law judge's credibility determination as evidenced by his reference to plaintiff's apparent intent "to avoid work and receive public assistance."  *A.R.* 24.

1.  The Assessment of Plaintiff's Mental Impairments by Her Treating
    Providers.

Plaintiff first contends that the administrative law judge erred in concluding that plaintiff's mental impairments neither meet nor equal Listing 12.04 and, further, do not render her disabled.  In making this argument, plaintiff appears to rely on the reports of her treating psychiatrist, Dr. Melhem, and her treating counselor, Stan Gornik.  The parties agree and the administrative law judge found that the record documents a mental impairment sufficient to meet Listing 12.04A.  However, the administrative law judge found that plaintiff's condition failed to satisfy the standards of either Listing 12.04B or 12.04C.

The Court notes, first, that the state agency psychologists reviewed the record in November 2003 and again in May 2004 and concluded that plaintiff's mental impairments meet neither the B criteria listing, *A.R.* 299, nor the C criteria of the listing.  *A.R.* 300.  In fact, the state agency psychologists concluded that plaintiff

> is capable of following at least simple instructions, she can attend to [simple routine repetitive tasks].  She can relate to coworkers and supervisors; work with the general public as contraindicated. [Plaintiff] has the capacity to adapt to a work setting with [simple routine repetitive tasks], [without] strict productivity or time demands and with limited contact with the general public.

*A.R.* 304.

The administrative law judge carefully evaluated plaintiff's

13

mental impairments by reference to Listing 12.04:

> The claimant has been diagnosed with a bipolar
> disorder and a depressive disorder, thereby meeting
> the "A" criteria in Section 12.04. The first area
> of the "B" criteria, "activities of daily living",
> include adaptive activities such as cleaning,
> shopping, cooking, taking public transportation,
> paying bills, maintaining a residence, caring
> appropriately for grooming and hygiene, using
> telephones and directories, and using a post
> office. The claimant reported in April 2003 that
> she did not care if her house was clean anymore.
> She stated that she spent her days staying in her
> room, listening to the radio and writing letters to
> her family (Exhibit 1E). By July 2003 the claimant
> stated that she could no longer care for herself.
> She said that "half of the time" she did not clean
> her home and when she did it took her two to three
> days to complete it (Exhibit 3E).
>
> When listing her activities of daily living in
> August 2003, the claimant reported watching
> television, straightening her house, sitting on the
> porch, preparing dinner, washing dishes, sweeping
> the floor, laundering clothes, shopping for
> groceries and gardening (Exhibit 4E). On
> evaluation with Dr. White in October 2003 the
> claimant reported her daily activities as watching
> television and bathing. She explained that she
> washed dishes, cleaned house, laundered clothes,
> cooked, shopped and lifted heavy items with
> assistance from her sons (Exhibit 7F). Likewise,
> in December 2003 and again in January 2004, the
> claimant reported doing her household chores with
> the assistance of her sons. She further noted that
> she had to be reminded to bathe on occasion
> (Exhibits 6E and 7E).
>
> At the hearing the claimant testified that her
> daily activities consisted of watching television,
> sitting on the couch, washing dishes, sweeping the
> floor and going to the grocery store occasionally.
> The Administrative Law Judge finds that the
> claimant has "mild" limitations in activities of
> daily living.
>
> The second area of the "B" criteria, "social
> functioning", refers to the claimant's capacity to
> interact independently, appropriately, effectively
> and on a sustained basis with other individuals.
> The claimant reported in April 2003 that she was
> irritable and yelled at her sons without reason

14

(Exhibit 1E).  The claimant is followed by Ali Melhem, MD. At her initial evaluation in May 2003, Dr. Melhem described the claimant as "calm and cooperative."  Although he noted her decreased speech and eye contract, the claimant denied any social or generalized anxiety symptoms (Exhibit 11F).

In August 2003 the claimant stated that she had disagreements with her boyfriend and sons.  She reported that she used to enjoy visiting with friends and going dancing, but no longer was interested.  The claimant added that she was not able to talk to people.  Noting that she was fearful of crowds, the claimant stated that she did not like being around "a lot" of people (Exhibit 4E).

In contrast, the claimant denied any fears or phobias to Dr. White just two months later.  He observed that her hygiene was "adequate" and her social skills and eye contract were "fair."  The claimant told Dr. White that she had problems getting along with neighbors, public officials and former bosses and coworkers.  Dr. White felt that the claimant's ability to get along with others was "mildly" impaired (Exhibit 7F).

Stan Gornik, MSW, LISW, the claimant's counselor, completed a mental assessment of the claimant's ability to perform work-related activities in December 2004.  He opined that the claimant would have "extreme" limitations in all areas of social interaction (Exhibit 18F).  In February 2005 Dr. Melhem completed a mental assessment of the claimant's ability to perform work-related activities.  Dr. Melhem, likewise, found that the claimant had "extreme" limitations in all areas of social functioning (Exhibit 25F).  Upon review of all of the medical evidence of record the Administrative Law Judge finds that the claimant has "moderate" limitations in social functioning.

The third "B" criterion, "concentration, persistence or pace", refers to the claimant's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. At his initial evaluation, Dr. Melhem noted that although the claimant reported having poor concentration abilities, she was able to follow directions and maintain her attention span "adequately." Further, the claimant

15

denied short, long-term or recent memory difficulties (Exhibit 11F). Yet, on a disability questionnaire completed less than three months later, the claimant reported "always" having memory problems. She added that she was unable to retain memories longer than two days and didn't even remember her childhood (Exhibit 4E).

In contrast, Dr. White found that the claimant was able to maintain attention throughout the interview October 2003. Although Dr. White felt the claimant's immediate memory was "mildly" impaired, her long term memory was described as "intact." He opined that the claimant's ability to remember, sustain and concentrate was "mildly" impaired (Exhibit 7F).

The claimant has been followed by Dr. Singh since 1996. The evidence of record indicates that Dr. Singh has consistently found the claimant's memory to be "intact" and her attention span and concentration to be "good" (Exhibits 10F and 17F). In contrast, Mr. Gornik rated the claimant's limitations in concentration, persistence and pace as "extreme" in all categories (Exhibit 18F). Dr. Melhem, likewise, felt that the claimant had "extreme" limitations in all areas of concentration, persistence and pace in February 2005 (Exhibit 25F). The Administrative Law Judge notes that the claimant was able to testify adequately and answer questions appropriately throughout the hearing regarding her current circumstances, as well as from the past. The undersigned finds that the claimant has, at most "moderate" limitations in concentration, persistence and pace.

The last area of functioning evaluated under the "B" criteria is "episodes of decompensation". This refers to exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. In June 2003 the evidence of record indicates that the claimant attempted suicide by taking an overdose of medication. Although when admitted to Belmont Community Hospital her Global Assessment of Functioning (GAF) was only 35, after three days of treatment she was discharged with a "brighter" affect and a GAF of 60, indicating only "moderate" symptoms according to the <u>Diagnostic and Statistical Manual of Mental</u>

16

Disorders, Fourth Edition (DSM-IV) (Exhibit 5F).

The claimant reported in August 2003 that stress caused her to "get all worked up," have headaches and feel depressed (Exhibit 4E). Mr. Gornik stated in December 2004 that the claimant had either "marked" or "extreme" limitations in all categories of adaptation. He opined that the claimant's mood instability with increased agitation, anger and anxiety would likely escalate with stress (Exhibit 18F). Dr. Melhem reported in February 2005 that the claimant's symptoms tended to be exacerbated by psycho-social stressors and daily pressures related to task completion. He rated the claimant's limitations in all categories of adaptation to be "extreme," except for her ability to maintain personal appearance and hygiene, which he felt was "marked" (Exhibit 25F). Yet, upon review of the treatment notes for both Mr. Gornik and Dr. Melhem, the Administrative Law Judge is unable to find a single observation of poor or inadequate hygiene, except in their disability questionnaires. In fact, Mr. Gornik consistently remarked that the claimant had "causal, neat dress and appearance" (Exhibits 11F and 19F). After careful consideration of the evidence of record, the Administrative Law Judge finds that the claimant has had "no" repeated episodes of decompensation of extended duration.

As the claimant has failed to establish that her affective disorder satisfies the "B" criteria of Section 12.04, the undersigned must further evaluate this condition under the "C" criteria. As outlined above, her condition has not resulted in repeated episodes of decompensation. Further, the report from the consultative evaluator fails to establish a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate. Finally, she has no history of one or more years of inability to function outside a highly supportive living arrangement. She does not satisfy the "C" criteria of Section 12.04.

*A.R.* 21-24.

The administrative law judge expressly rejected the extreme limitations reflected in the assessments of Dr. Melhem and Mr. Gornik:

> Keeping in mind [their] relatively moderate
> findings and GAF scores, one is literally shocked
> to see the drastic limitations imposed by the
> claimant's psychiatrist and therapist. For
> example, Dr. Melhem states that the claimant had an
> extreme limitation in the ability to accept
> instruction from or respond appropriately to
> criticism from supervisors or superiors. One
> wonders what this could possibly be based on. The
> claimant worked for a number of years as a nurse's
> aide and obviously had supervisors, who must have
> given her instructions from time to time. She
> testified that she left this job, not because of
> any psychological difficulties, but because of
> supposed migraines and body aches. In all candor,
> the Administrative Law Judge begins to seriously
> doubt the reliability and credibility of any
> medical provider who could form these truly radical
> kinds of conclusions based on nothing but the
> claimant's subjective complaints (Exhibit 18F and
> 25F).
>
> The same is true of their assessments that the
> claimant had marked limitations in the ability to
> work in coordination with or in proximity to others
> and to respond appropriately to coworkers or peers.
> As stated above, the claimant did all of this for
> a number of years. It is simply not credible that
> she suddenly lost these abilities after she stopped
> working for another reason (Exhibit 18F and 25F).
>
> Because the conclusions in these completed
> questionnaires are based exclusively on the
> claimant's subjective complaints, have no sort of
> independent support in the record whatsoever, are
> not supported by the treatment records and are
> contrary to the claimant's own work history, the
> Administrative Law Judge rejects them in total.

*A.R.* 28.

Opinions of treating physicians must be accorded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2). If the administrative law judge finds that either of these criteria have not been met, he is then required to apply the following factors in determining the weight to be given a treating physician's opinion: "The

length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. ..." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). In this regard, the administrative law judge is required to look at the record as a whole to determine whether substantial evidence is inconsistent with the treating physician's assessment. *See* 20 C.F.R. §404.1527(d)(2),(4).

In refusing to give controlling weight to a treating physician's opinion, an administrative law judge must adhere to certain agency-imposed procedural requirements. The administrative law judge must "evaluate every medical opinion[] receive[d]" and must "give good reasons in [his] notice of determination or decision for the weight[] give[n]" to a treating physician's opinion. 20 C.F.R. §404.1527(d); *Wilson,* 378 F.3d at 544. *See also Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242-43 (6th Cir. 2007).

Even when a treating physician's opinion does not deserve "controlling weight," the administrative law judge "must" consider "certain factors -- namely, the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source -- in determining what weight to give the opinion." *Wilson,* 378 F.3d at 544. In other words, "a decision denying benefits 'must contain *specific reasons* for the weight given to the treating [provider's] opinion.'" *Id.* (emphasis added).

In this action, the administrative law judge gave extensive consideration to the entire record and the reports and assessments of Dr.

19

Melhem and Mr. Gornik. The reasons given by the administrative law judge for giving those assessments no weight whatsoever, (*i.e.*, because they "are based exclusively on the claimant's subjective complaints, have no independent support in the record whatsoever, are not supported by the treatment records and are contrary to the claimant's own work history," *A.R.* 28), are amply supported in the evidence of record.

2. The Administrative Law Judge's Credibility Findings

Plaintiff also objects to the administrative law judge's credibility determination. The administrative law judge found that plaintiff "is exaggerating her symptoms substantially." *A.R.* 24. According to plaintiff, this finding appears to be based "particularly" on the fact that Ms. Hummel and her boyfriend receive public assistance. *Plaintiff's Statement of Errors,* at 10. A fair reading of the administrative law judge's thoughtful and detailed decision makes clear that his credibility determinations were based on the record as a whole and not simply upon plaintiff's receipt of benefits. *See A.R.* 24-28. For example, the administrative law judge noted that many of plaintiff's subjective complaints are unsupported by any objective medical evidence, that she has been less than truthful with her examining and treating physicians and that she has been non-compliant with treatment recommendations.

The assessment of credibility made by an administrative law judge is entitled to great weight and deference because it is the administrative law judge who had the opportunity to observe the witness' demeanor. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Walter v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Whenever a claimant's complaints regarding symptoms, or their intensity and

persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'" *Rogers,* 486 F.3d at 247.

In making his credibility determination, the administrative law judge expressly invoked the standards of 20 C.F.R. §§1404.1529, 416.929 and Social Security Ruling 96-7p. *A.R.* 24. The administrative law judge went on to consider the record as a whole. Because the credibility determination made by the administrative law judge is explained and enjoy substantial support in the record, this Court is without authority to revisit that determination. *See Felisky v. Bowen,* 35 F.3d 1027 (6th Cir. 1994).

3. Combined Effect of Plaintiff's Impairments

Finally, plaintiff contends that the administrative law judge failed to consider the combined effect of plaintiff's impairments. The Social Security Act requires the Commissioner to consider the combined effects of impairments that, individually, may be non-severe but which, in combination, may constitute a medically severe impairment or otherwise evidence a claimant's disability. 42 U.S.C. §423(d)(2)(C). Contrary to the contention of the plaintiff, however, the administrative law judge in this case did in fact consider all of plaintiff's impairments, both severe and non-severe. For example, the administrative law judge found that "plaintiff has no impairments considered individually or in combination with other impairments, which meet or equal the criteria of any of the listed impairments. ..." *A.R.* 21. In determining plaintiff's residual functional capacity, moreover, the administrative law judge recognized that he must consider what "an individual can still do after

considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. ..." *A.R.* 24. Moreover, the administrative law judge expressly took into account conditions claimed by plaintiff but for which the administrative law judge found no objective support:

> Although the Administrative Law Judge found no objective evidence to support the claimant's allegations of fibromyalgia and emphysema, the undersigned has given the claimant the maximum benefit of doubt and reduced the exertional level of her residual functional capacity to light and limited her exposure to environmental pollutants.

*A.R.* 29. In any event, plaintiff does not suggest what additional limitations, not included in the administrative law judge's residual functional capacity assessment, result from her impairments.

In short, the Court concludes that the administrative law judge's decision applied all applicable laws and standards regarding consideration of the plaintiff's claims and that the administrative law judge's findings and conclusions enjoy substantial support in the record.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED**.

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within ten (10) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1); F.R. Civ. P. 72(b). Response to objections must be filed within ten (10) days after being served with a copy thereof. F.R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de*

*novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).


February 21, 2008                         *s/Norah McCann King*
                                    Norah McCann King
                             United States Magistrate Judge